### CONCORD v. RUMNEY.

The mere fact of insanity without more, is not a sufficient ground for a decree of nullity of marriage.

To disable one to contract, the disease must be of such a nature or of such severity, that the person is incapable of exercising a rational judgment on the subject in question.

A person actually insane may acquire a home in the place of her actual residence, if she has sufficient capacity to choose her residence.

A woman insane at the time of her marriage and afterwards, and whose marriage is decreed to be null for that cause, may gain a settlement by her residence in the house of her husband, if she has sufficient property, and intellect sufficient to choose a home.

ASSUMPSIT for the support of Ruth Keyes at the Insane Asylum, a pauper, from June 17th to Sept. 8th, 1862.

The point in controversy is the alleged settlement of the pauper in Rumney, and, for the purposes of this trial, the parties agree upon the following facts on that point : Said Ruth Keyes was married to Ephraim Keyes, Dec. 2d, 1844, under the circumstances stated in *Keyes* v. *Keyes*, 22 N. H. 553, which are admitted as true. Said Ephraim Keyes then had a settlement in Rumney and continued to reside in Rumney until and after the decree of nullity of marriage was made, July Term, 1851, as appears in said case.

The plaintiffs claim that said Ruth continued to reside with said Eph-

raim until said July Term, 1851, except occasional temporary absences in other towns, and as an inmate of the Asylum for the Insane at Concord for a time; and that at the time of the marriage, said Ruth had personal property of the value of over four hundred dollars, which said Ephraim took into his possession, and continued to hold until it was placed in the hands of a trustee for her, at the time of the decree, as stated in the note to the reported case. But the defendants claim that said Ruth did not live in Rumney but sixteen months after said marriage; that said Ephraim did not receive but the sum of three hundred dollars, which was all the property said Ruth had at the time of said marriage, and that said Keyes had expended a much larger sum than that for her support at the Asylum for the Insane and elsewhere; and that the sum of four hundred dollars mentioned in said note, was given by said Ephraim as a mere gratuity for her benefit. As to these facts the parties are to have a trial, if the court deem them material.

It is admitted that said Ephraim was taxed in said Rumney during said time, and the taxes were paid by him. But none were asseseed against said Ruth.

If the court shall be of opinion, that, under the circumstances above stated, said Ruth gained a settlement in Rumney, judgment is to be rendered for the plaintiffs, for the amount claimed and cost; otherwise for the defendant; provided, however, that if any facts, not stated herein as admitted by the parties, shall in the opinion of the court be material, either party shall have a right to trial as to them, if the parties do not agree upon them.

*Minot & Mugridge,* for plaintiffs.

I. If the marriage of December 2, 1844 be held valid, the pauper thereby acquired the settlement which her husband then had in Rumney. Rev. Stat. ch. 65.

II. If that marriage be held entirely null and void, the pauper gained a settlement in Rumney in the fourth mode prescribed by the statute, having personal estate to the value of $250, &c. For if the marriage were null and void, the supposed husband had no right to the property of the pauper, but having taken it into his possession, he must be regarded as trustee of it for her, or as debtor to her for its value, and the property, or the claim for its value, would be personal estate of hers sufficiently for the purpose of gaining a settlement. *Andover* v. *Merrimack Co.*, 37 N. H. 437.

It cannot be claimed that there was any actual, or implied gift of the property by her to him; for it was by him as husband. Besides, the same insanity, which rendered her incapable of making a valid contract of marriage, rendered her equally incapable of making any disposition of her property, by gift or otherwise.

The parties at the time regarded themselves as husband and wife. The temporary absences of the wife, therefore, did not affect that residence and home which the husband had in Rumney, and which the wife

intended to have there with him.  And especially so, if the wife, at the time of those absences, was insane, and therefore incapable of any intelligent change of domicil.

The alleged expenses by the husband for the support of the wife do not affect the legal result.  If those expenses are to be regarded on the one side, the services, &c., of the wife must be regarded on the other. But neither are to be considered.  The supposed relation of the parties as husband and wife, forbids the idea of any intended or supposed claim on either side on any such account.  Whatever was done on both sides was done by the parties as husband and wife, and not as creditors or debtors ; and under such circumstances no claim or liability would arise on either side.  The considerations, which would arise in any attempted adjustment of accounts between parties cohabiting together under such circumstances, are too various and indefinite for determination by pecuniary values.

The proceedings in *Keyes* v. *Keyes* show the views of the court in this respect.  The property ordered by the court to be placed in the hands of the trustee for her was as her rightful property, and not as any gratuity from him ; and it was the whole amount of the property taken by him, without any deduction or consideration of subsequent expenses by him on her account.

*J. Quincy*, for defendant.

I.  The marriage of the pauper of December 2d, 1844 was null and void, and the pauper did not acquire thereby the settlement which her husband then had in Rumney.  *Keyes* v. *Keyes*, 22 N. H. 551 ; *Middleborough* v. *Rochester*, 12 Mass. 363 ; *Goshen* v. *Richmond*, 4 Allen, 458.

II.  Under the fourth mode of acquiring a settlement, the pauper must dwell and have his home, and possess personal property to the value of $250, for four consecutive years.  37 N. H. 437.

As to the pauper's home, the case finds that she came to Rumney on her marriage, Dec. 2, 1844 ; that she then was and had for a long time before been insane, and had been an inmate of the Asylum at Concord. To constitute a domicil, two things are necessary—residence and intention there to remain.  *Jennison* v. *Hapgood*, 10 Pick. 98 ; 2 Kent's Com. 430, & note ; Story on Conflict of Laws, 42 ; *Hallowell* v. *Saco*, 5 Maine, 145.  The pauper being insane was not capable of acquiring a settlement in Rumney, by any act requiring volition.  She could have no *animus manendi*.  She was "incapable of any intelligent change of domicil."  See plaintiff's argument, II.

There are authorities which decide that a residence, in case of insanity, may be established without any voluntary act of the person, in such a manner as to have the effect to give a settlement by dwelling and having his home in a particular town, *Auburn* v. *Hebron*, 48 Me. 332, and authorities there cited.  In such cases, however, where the person has no guardian, the residence must be actual, and continued without

any interruption for the time prescribed by the statute. No question can arise, whether "occasional absences in other towns, and as an inmate of the Insane Asylum," were only temporary, as claimed by the plaintiff, because she had no volition and could have no intention of returning. Such absences would interrupt the continuity of her residence and prevent her settlement. No presumption can arise that she intended to return to the home of her husband, inasmuch as she was incapable of having any design or intention on the subject.

Next, as to the property. As between the pauper and her husband, the rights, liabilities and duties growing out of the marriage relation did not attach to either of them. As to each other, they were as if they had never been married. The property of the wife, which went into the hands of her husband, was delivered by her to him as her husband; was received by him as such. She had no claim, which she or her guardian could enforce, and consequently had no property, by which to acquire a settlement. The same fraud, which rendered the contract of marriage null and void, to which he was not a party, placed the property in his hands, and it could not be recovered back from him. He was not in any sense her debtor. As to this, the relation of debtor and creditor did not exist between them. Argument for plaintiff, II.

The plaintiff contends that Keyes must be regarded as trustee. If so his account as trustee must be settled according to the just, equitable and well established principles governing such cases. This must be done before it can be determined whether she had $250 during the required time. The plaintiff contends that the property of the pauper must remain in the hands of the trustee, and cannot be applied to her maintenance. If so she having resided in Concord at the Asylum, for the last four years, and having the requisite amount of property in the hands of the trustee, she has acquired a settlement there. At any rate, she is not a pauper with so much property in the hands of her trustee.

The provision of the statute in respect to property is founded in the reason, that the property thus held could and ought to be taxed for the term of four years. If so, could the selectmen of Rumney, before the decree of divorce, have regarded it any otherwise than as the property of her husband, and if so can it be held, as against Rumney, that by virtue of the property she obtained a settlement in her own right, irrespective of her husband?

BELL, C. J. By the judgment of the court in *Keyes* v. *Keyes*, the marriage between them was decreed to be null and void from the first, upon the ground of the insanity of the libellee at the time, and of fraud in inducing the marriage. By the decision it is settled, that, as between the parties, the libellee was so insane as to be incapable of contracting a valid marriage. The facts of the case, as stated in the report, do not establish this conclusion, and we must therefore suppose that the evidence, which is not reported, must have shown a degree of insanity sufficient to sustain the decision.

The facts stated in the report are admitted, and we are not, for the

purposes of this case, at liberty to assume others. By the decree of nullity, the parties were pronounced never to have contracted a valid marriage. Of course, the pauper, Mrs. Keyes, retained the power of gaining a new settlement, if she had sufficient mental capacity. Her previous settlement was in no way affected by the supposed marriage, and, of course, still continues, unless the pauper has gained a new settlement in Rumney in some other mode. By the 4th clause of the 1st section of chapter 65 of the Revised Statutes, (C. S. 165,) "any person of the age of twenty-one years, having * * personal estate of the value of $250 in the town where he dwells and has his home, and paying all taxes duly assessed on him and his estate for four years in succession, shall thereby gain a settlement in said town."

The plaintiffs allege that the pauper continued to reside with her supposed husband at Rumney, from her marriage in December, 1844, till the decree of nullity at July Term, 1851, except occasional temporary absences in other towns, and as an inmate of the Asylum for the Insane at Concord for a time. At the time of her marriage, she had personal property exceeding $250 in amount, which her supposed husband took into his possession, and, before the decree of nullity, placed in the hands of a trustee for her benefit. It is admitted that no taxes were assessed on this property. It is not suggested that the taxes, if any were assessed on the husband for this property, were not paid.

To make a place the home of a person, two things are essential—actual residence and an intention to remain indefinitely; in other words, a general intention to remain, with no definite purpose to remove elsewhere. *Ringgold* v. *Barley*, 5 Md. 186, (15 Dig. 190); *Chaine* v. *Wilson*, 1 Bosw. 673; *Hegeman* v. *Fox*, 31 Barb. 475; *Jennison* v. *Hapgood*, 10 Pick. 98; *Leach* v. *Pillsbury*, 15 N. H. 137; *Moore* v. *Wilkins*, 10 N. H. 455; sec. 5, ch. 24, Rev. Stats. If a home is once acquired, it will not be lost by any temporary absence. *Warren* v. *Thomaston*, 43 Me. 406; *Lindsay* v. *Hapgood*, 11 Mass. 359; *Atherton* v. *Thornton*, 8 N. H. 180. So that probably the only question as to the home of the pauper depends on the question, whether she had, at the time of her marriage, the legal capacity to intend to make Rumney her home. If she had not, that is decisive of the case.

It seems to have been once the doctrine of the courts, that an insane person could do no legal or binding act. Wh. & Stille Med. Jur. secs. 16 and 17; *Beverley's Case*, 5 Co. 123. But we regard it as now settled, that the mere fact of insanity without more, does not disable a party to bind himself by any act or contract; and it does not exonerate him from responsibility, either civil or criminal. The proof which is designed to invalidate a man's act by reason of his insanity must show that the disease is of such nature, or of such severity, that the person is incapable of understanding what he is doing, or of exercising a rational judgment in relation to the subject, and, in the case of a charge of crime, that he was incapable of distinguishing between right and wrong in the particular case, or of controlling the impulses of his own mind.

Insanity may exist in various degrees, from the slight attacks which are hardly distinguishable from eccentricity, to the most raving and un-

controllable madness.   It may be general, seeming to affect all the op-
erations of the mind upon all subjects, or it may exist only in reference
to a small number of subjects, or a single subject; the mind, in such
cases of partial insanity, seeming to be in its habitual and natural condi-
tion as to all subjects and matters which do not come within the scope
of the partial disease.   Wh. & St. sec. 18, &c. ; *Converse* v. *Con-
verse*, 21 Vt. 168 ; *Dennett* v. *Dennett*, Rock. June Term, 1863.   In
no case, at the present day, is it a mere question, whether a party is in-
sane.   The point to be established is, whether the party is so insane as
to be incapable of doing the particular act with understanding and rea-
son.   *Ball* v. *Mannin*, 1 Dow. P. C. N. S. 380 ; 3 Bligh. N. S. 1 ;
1 Smith & Batty, 454 ; Shelf. Lun. 255, 455 ; *Portsmouth* v. *Ports-
mouth*, 1 Hagg. Ec. Rep. 355.   This would be the essential question
now, where a marriage was alleged to be void by reason of insanity,
*Middleborough* v. *Rochester*, 12 Mass. 363, and the same test would
be applied in determining the question of capacity to change the domi-
cil : Had the party at the time sufficient reason and understanding to
choose her place of residence ?

Marriage is a contract of the highest importance to the welfare and
happiness of the individual, and it may be of great consequence to the
connexions of the sufferer.   To judge intelligently on that subject, em-
bracing the character, situation, and prospects of the parties, a sound
judgment on that subject at least might seem to be indispensable.   It
would be quite a different matter with the selection of a home, which
draws after it no very important consequences, and may be changed by
the party at pleasure, and under the influence of very slight reasons.
For an act of so slight importance, a high grade of intellectual power
could hardly be required.   The mind of a party might be much impair-
ed, or it might be very generally under the influence of insane delusions,
and yet if those insane influences had no bearing upon the selection of a
home, the legal capacity to choose a place of residence might not be af-
fected.   "If it were admitted," says Wilde, J., in *Holyoke* v. *Haskins*,
5 Pick. 26, "that idiots and persons wholly bereft of understanding are
incapable of changing their domicil, it would not follow that the same
incapacity would attach to all degrees of mental imbecility.   There are
those, and not a few, who may be unable to manage their property and
other concerns with good judgment and discretion, and may need guar-
dians to protect them from imposition, and who nevertheless have suffi-
cient understanding to choose their homes."   This question is therefore
a matter of fact to be settled by a jury.

The marriage of Keyes and the pauper being adjudged null, their re-
lations were those of strangers in point of law, and yet the relations,
they supposed to exist between them, must have a decisive effect upon
the inferences to be drawn from their conduct.   And we think it clear,
that, where two persons live together in the supposed relation of mar-
ried persons, what was done by each for the other must be intended to
be done as a kindness, and without expectation of payment, and the law
will not imply any contract on the part of either to allow or pay for
any services or expenses incurred for the other.   The supposed husband

would have no claim to be paid for board, clothing, or expenses of any kind of the wife, either directly or by any set-off, nor the supposed wife any similar claim against him. *Munger* v. *Munger*, 33 N. H. 581 ; *Seavey* v. *Seavey*, 37 N. H. 133.

Upon these views the case must be discharged.